IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| CONCORD CROSSROADS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:20-cv-00589 (RDA/IDD) |
| | ) | |
| HUMAN CAPITAL RESOURCES AND | ) | |
| CONCEPTS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendant Human Capital Resources and Concepts, Incorporated's ("Defendant") Motion to Dismiss Amended Complaint ("Motion"). Dkt. 30. This Court dispenses with oral argument as it would not aid in the decisional process. Fed. R. Civ. P. 78; Loc. Civ. R. 7(J). Accordingly, this matter is now fully briefed and is ripe for disposition. Considering Plaintiff Concord Crossroads, LLC's ("Plaintiff") Amended Complaint (Dkt. 15), Defendant's Memorandum in Support of the Motion (Dkt. 31), Plaintiff's Memorandum in Support of its Opposition to Defendant's Motion ("Opposition") (Dkt. 33), and Defendant's Reply Memorandum in Support of the Motion ("Reply") (Dkt. 34), and for the following reasons, it is hereby ORDERED that Defendant's Motion (Dkt. 30) is DENIED.

## I.  BACKGROUND

### A.  Factual Background

For purposes of considering the Motion, the Court accepts all facts contained within the Amended Complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In the Amended Complaint, Plaintiff alleges the following facts.

On March 23, 2018, Defendant, Plaintiff, and M. Holland Group, LCC ("MHG"), executed a "teaming agreement" in an effort to pursue a contract under the United States Department of the Army ("Army"), Office of the Provost Marshall General ("OPMG"), Anti-Terrorism Program procurement ("OPMG Program").[1]  Dkt. 15, ¶¶ 5, 8, n. 1.  The OPMG Program was then offering to contract with a small business as a "set aside" under the Small Business Association's ("SBA") 8(a) Business Development Program.[2]  *Id.* at ¶ 6.

Plaintiff was the incumbent prime contractor for the OPMG Program, having obtained the prime contract for the OPMG Program over the previous fifteen years.  *Id.*  However, once Plaintiff graduated from the SBA 8(a) Program, Plaintiff was no longer eligible to be the prime contractor

---

[1] As set forth on the United States Army's website,

> [t]he Office of the Provost Marshal General (OPMG) is responsible for the policy, plans, programs, oversight and budget for the Army's policing functions, including law enforcement, criminal investigations, criminal intelligence fusion, corrections, biometrics & forensics, physical security, high risk personnel security, antiterrorism and detention operations in coordination with Department of Defense (DoD) and the law enforcement community.

U.S. Army, Office of the Provost Marshal General, Mission, https://www.army.mil/opmg#org-about (last visited May 18, 2021).  Major General Donna Martin currently serves as the United States Army's Provost Marshal General.  *Id.*

[2] "The federal government sets aside approximately one quarter of its actual procurement budget for the procurement of goods and services from small business concerns," which are also known as SBCs.  *Morris-Griffin Corp v. C&L Serv. Corp*, 731 F. Supp. 2d 488, 490 (E.D. Va. 2010).  The U.S. Small Business Administration's ("SBA") 8(a) Business Development program is designed to "provide a level playing field for small businesses that are owned by socially and economically disadvantaged people or entities[.]"  U.S. Small Business Administration, *8(a) Business Development Program*, https://www.sba.gov/federal-contracting/contracting-assistance-programs/8a-business-development-program (last visited May 18, 2021).  Businesses that qualify for the program are able to (1) "[c]ompete for [certain] set-aside and sole-source contracts in the program[;]" (2) "[g]et a Business Opportunity Specialist to help navigate federal contracting[;]" (3) "[f]orm joint venutres with established businesses through the SBA's mentor- protégé program[;]" (4) "[r]eceive management and technical assistance, including business training, counseling, marketing assistance, and high-level executive development."  *Id.*

for the OPMG Program. *Id*. Yet, Plaintiff could still work as a subcontractor under an OPMG Program prime contractor who was an existing SBA 8(a) Program participant. *Id*. at ¶ 7. Accordingly, "based on its . . . long and successful history of performing contracts administered under the OPMG Program," and that "OPMG desired [ ] [Plaintiff's] continued support of the OPMG Program[,]" Plaintiff sought to subcontract with a SBA 8(a) Program participant. *Id*. at ¶ 8-10.

MHG then introduced Plaintiff's President and Chief Executive Officer, Claude A. Wood ("Mr. Wood"), to Defendant's Chief Executive Officer and President, Ms. Marnice D. Miller ("Ms. Miller"), as Defendant was a potential prime contractor. *Id*. at ¶¶ 11, n.1. Subsequently, Plaintiff, Defendant, and MHG executed the teaming agreement. *Id*. at ¶ 11. Under the teaming agreement, Defendant "promised to submit a proposal to the Army for a follow on OPMG Program 8(a) contract award." *Id*. at ¶ 12. And, conditioned upon Defendant being awarded such contract, Defendant "agreed to negotiate subcontracts with" Plaintiff and MHG. *Id*. Moreover, under the teaming agreement, Plaintiff agreed to, *inter alia*, "develop the complete proposal package for [Defendant] to submit to the Army;" clarify the proposal package, as needed; and "participate in all applicable discussions with the Army. . . ." *Id.* at ¶ 13. Plaintiff also "agreed to use its significant government contract knowledge and experience to mentor [ ] [Defendant] regarding government contracts generally, provide [ ] [Defendant] additional business development support and assist [ ] [Defendant] in identifying and pursuing other SBA 8(a) contract opportunities." *Id*. at ¶ 14.

On April 23, 2018, the Army awarded a "follow on OPMG Program contract" ("OPMG Contract") to Defendant "as a direct result of [ ] [Plaintiff's] assistance[.]" *Id*. at ¶ 15. Following the award of the OPMG Contract, "[Defendant] reneged on its promise to offer MHG a subcontract

and terminated its relationship with MHG[.]" *Id.* at ¶ 16, n.1. Nevertheless, Plaintiff and Defendant began negotiating a subcontract. *Id.* at ¶ 17.

After negotiations commenced, Plaintiff and Defendant reached an "impasse," as it pertained to the subcontract. *Id.* But on April 23, 2018, "Ms. Miller asked Mr. Wood to provide 100% of the [OPMG] [C]ontract support, including 100% of the personnel, program management support and [ ] [Plaintiff's] TOP SECRET Facilities Clearance," which apparently were necessary for Defendant to perform under the OPMG Contract. *Id.* at ¶ 18 (capitalization in original). Ms. Miller requested that Plaintiff provide these necessities "for . . . [an] interim period until Ms. Miller and [ ] [Defendant] could assemble a new team and obtain the required TOP SECRET Facilities Clearance." *Id.* (capitalization in original). In exchange for providing the support, personnel, management, and Facilities Clearance, Plaintiff alleges that "Ms. Miller promised Mr. Wood that [ ] [Defendant] would pay [ ] [Plaintiff] at the rates [ ] [Defendant] submitted to OPMG in its pricing proposal." *Id.* Ultimately, the parties agreed to these terms for this "interim" period, *id.* at ¶ 20, and from on or about April 24, 2018, through June 29, 2018, "with [ ] [Defendant's] knowledge, encouragement, and approval," Plaintiff provided the aforementioned necessities that Defendant lacked and "performed 100% of the OPMG Contract work," *id.* at ¶ 21. This period constituted the first 65 days of performance under the OPMG Contract. *Id.* According to Plaintiff, during this time, Defendant was aware of Plaintiff's desire to be paid for its services at certain hourly rates and compensated for travel and other expenses germane to Plaintiff's performance. *Id.*

On May 2, 2018, Ms. Miller appointed Mr. Wood as Program Manager for the OPMG Contract. *Id.* at ¶ 28. In this capacity, Mr. Wood would "represent . . . [ ] [Defendant] as lead Technical Point of Contact for the [OPMG] [C]ontract and [for] [ ] [Defendant]." *Id.* Additionally,

Plaintiff's staff members "accounted for 100% of the personnel positions" for the first 65 days of the OPMG Contract performance. *Id*.

Further, during the 65-day interim period of Plaintiff's OPMG Contract performance, Plaintiff submitted to Defendant six invoices totaling $173,646.16. *Id*. at ¶ 29. In those invoices, Plaintiff requested compensation from Defendant for the work Plaintiff performed, and work which the Army accepted. *Id*. In turn, Defendant rejected Plaintiff's requests for payment, arguing that Plaintiff was only "entitled to 51% of the payment for the work Plaintiff performed" according to certain limitations on subcontracting. *Id*. at ¶ 30. Defendant urges that this was true even though Defendant did not provide Plaintiff any basis for this perspective under the OPMG Contract during the interim period. *Id*. Plaintiff maintains in its Amended Complaint that during the time that Plaintiff and Defendant negotiated Plaintiff's interim contract performance, both Plaintiff and Defendant were aware of the subcontracting rule later raised by Defendant. *Id*. at ¶ 31.

Furthermore, in a May 14, 2018 email, Ms. Miller told Mr. Wood that should "[a]ll [ ] [of Plaintiff's employees [ ] remain [i]n [ ] [their] roles until which time [ ] [Defendant ha[d] received its DD254 (this should be less than 30 days), during this period[,] [ ] [Defendant] w[ould] charge a 10% pass through on the monthly labor until the positions are transferred." *Id*. at ¶ 24. Although Plaintiff in its Amended Complaint does not define what a DD254 is, it contends that "[b]ut for [ ] [Defendant's] agreement to receive a 10% fee," and but for the parties' agreement for Defendant to pay Plaintiff "at the rates [ ] [Defendant] submitted to OPMG in [ ] [Defendant's] pricing proposal[,]" *id*. at ¶ 18, Plaintiff "would not have agreed to provide [Defendant] support for the interim period[,]" *id*. at ¶ 21.

Then, Plaintiff asserts, on June 24, 2018, "Ms. Miller . . . promise[d] [ ] Mr. Wood . . . that she would use her personal funds to ensure that [ ] [Plaintiff's] personnel [that were] working on

the OPMG Contract were paid." *Id*. at ¶ 24.  Plaintiff also maintains that this representation caused it to continue to perform during the interim period.  *Id*. at ¶ 25.

On August 17, 2018, Defendant offered to pay Plaintiff $74,976.00 for its work during the prior interim period.  *Id*. at ¶ 33.  Plaintiff found the offer deficient and therefore declined the offer. *Id*. at ¶ 34.  Despite having received "approximately $1,349,620[.00]" from the Army, to date, Defendant has only paid Plaintiff $4,486.37 for travel invoices and $462.00 for storage invoices. *Id*. at ¶¶ 36-37.

### B.  Procedural Background

On April 16, 2020, Plaintiff originally filed the instant action in the Prince William County Circuit Court.  *Id*. at 1.  On May 26, 2020, Defendant filed a demurrer in that court and removed the matter to this Court.  Dkt. Nos. 1-3; 1.  On June 2, 2020, Defendant filed a Motion to Dismiss Plaintiff's original Complaint, arguing that dismissal was appropriate pursuant to Federal Rule of Civil Procedure 12(b)(6).  Dkt. Nos. 3; 4.  In turn, on June 16, 2020, Plaintiff filed its Opposition to Defendant's Motion.  Dkt 7.  On June 23, 2020, Defendant filed its Reply.  Dkt. 8.  The Court granted the Motion to Dismiss in part and denied it in part.  Dkt. 14.  Specifically, the Court ordered that Counts One and Two of the Complaint, which set forth claims of breach of contract, be dismissed with prejudice.  *Id*. at 7, 23.  The Court denied Defendant's Motion to Dismiss with respect to Count Three, wherein Plaintiff alleged unjust enrichment, and dismissed without prejudice Count Four, an allegation of fraud in the inducement.  *Id*.

On September 17, 2020, Plaintiff filed its Amended Complaint, modifying its fraud in the inducement claim, and subsequently sought leave to amend.  Dkt. Nos. 15; 17.  The Court granted Plaintiff leave to amend.  Dkt. 29.

Defendant then filed the instant Motion, arguing once again that the Plaintiff in its Amended Complaint failed to state a plausible claim of fraud in the inducement.  Dkt. 31.

## II.  STANDARD OF REVIEW

A Federal Rule of Civil Procedure 12(b)(6) motion should be granted unless an adequately stated claim is "supported by showing any set of facts consistent with the allegations in the complaint."  *Twombly*, 550 U.S. at 561 (internal citations omitted); *see* Fed. R. Civ. P. 12(b)(6). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do."  *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555.  A complaint is also insufficient if it relies upon "naked assertions devoid of further factual enhancement."  *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555.

To survive a Rule 12(b)(6) motion to dismiss, a complaint must set forth "a claim for relief that is plausible on its face."  *Id.*; *Twombly*, 550 U.S. at 570.  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*; *Twombly*, 550 U.S. at 556.  In considering a Rule 12(b)(6) motion, a court must construe the complaint in the light most favorable to the plaintiff, read the complaint as a whole, and take the facts asserted therein as true.  *See E. Shore Mkts., Inc. v. J.D. Assoc. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000); *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993).  In addition to the complaint, a court may also examine "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). "Conclusory allegations regarding the legal effect of the facts alleged" need not be accepted. *Labram v. Havel*, 43 F.3d 918, 921 (4th Cir. 1995); *see also E. Shore Mkts., Inc.*, 213 F.3d at 180 ("While we must take the facts in the light most favorable to the plaintiff, we need not accept the

legal conclusions drawn from the facts . . . . Similarly, we need not accept as true unwarranted inferences, unreasonable conclusions, or arguments.").

Though generally, "extrinsic evidence should not be considered at the 12(b)(6) stage," the United States Court of Appeals for the Fourth Circuit has opined that "when a defendant attaches a document to its motion to dismiss, 'a court may consider it in determining whether to dismiss the complaint [if] it was integral to and explicitly relied on in the complaint and [if] the plaintiff[] do[es] not challenge its authenticity." *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004) (quoting *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999)). "A document is integral to the complaint where it is significantly related to a cause of action, and it is authentic when it is not in dispute by the opposing party." *McGlothian v. Fralin*, No. 3:18-cv-507, 2019 WL 1087156, at *7 (E.D. Va. Jan. 23, 2019) (citations omitted).

Pursuant to Fed. R. Civ. P. 9(b), certain elements of a fraud claim are subject to a "heightened pleading standard[.]" *Carlucci v. Han*, 886 F. Supp. 2d 497, 509 (E.D. Va. Aug. 7, 2012) (citing Fed. R. Civ. P. 9(b)). To be sure, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

## III.  ANALYSIS

Defendant asks this Court to dismiss Plaintiff's fraudulent inducement claim with prejudice. Dkt. 31, 4. Defendant contends this disposition is warranted for the following four reasons: because (1) Plaintiff has not alleged the existence of a valid contract, *id*. at 5-6; (2) Plaintiff "has not alleged misrepresentation of a positive statement of fact[,]" *id*. at 6; (3) Plaintiff improperly relies "on oral statements which it knows are contradictory to or in violation of

[f]ederal [l]aw[,]" *id*. at 7; and (4) Plaintiff "has failed to cure the pleading deficiencies of its original Complaint[,]" *id*. at 7-9.

In response, Plaintiff counters that its fraudulent inducement claim should survive Defendant's second Rule 12(b)(6) attack because (1) that claim "arises from the [tortious] duty not to mislead others to their detriment and is not dependent on the existence of a contract[;]" and (2) Plaintiff believes it has "adequately pleads each and every element" required to establish such a cause of action. Dkt. 33, 1.

The Court will address these arguments in turn.

A. Whether Plaintiff's Fraudulent Inducement Claim Must Fail Because If There is No Valid Contract

One of the questions before this Court is whether a plaintiff may assert a claim of fraudulent inducement even though a plaintiff has not pleaded sufficient facts to show that a valid contract has been formed. Plaintiff claims that it may do so, as a claim of fraudulent inducement may be couched in tort. Dkt. 33, 1. Defendant contends that Plaintiff may not do so. Dkt. 31, 5-6.

"It is a long-recognized principle that federal courts sitting in diversity 'apply state substantive law and federal procedural law.'" *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 417 (2010) (quoting *Hanna v. Plumer*, 380 U.S. 460, 465 (1965)). In Virginia, "[t]he duty not to mislead others to their detriment arises from common law and not contract[.]" *Fenner BL, LLC v. Fenner Garden Partners, LLC*, No. CL17-13859, 2018 WL 9393019, * 3 (Va. Cir. Apr. 30, 2018). Thus, "Virginia law recognizes the separate tort of fraud, even where the parties have agreed to a contract[.]" *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 628 (4th Cir. 1999). The Fourth Circuit's use of the word "even" suggests that fraud claims may exist notwithstanding whether a valid contract has been formed. *Id*. And as this Court has explained, "[a]lthough contract-related, fraudulent inducement is a tort." *New Venture*

9

*Holdings, L.L.C. v. DeVito Verdi, Inc.*, No. 2:18-cv-370, 2020 WL 6866563, *7 (E.D. Va. Jan. 7, 2020) (citing *Hitachi Credit Am. Corp.*, 166 F.3d at 628).

Moreover, looking to state substantive law on the issue of fraudulent inducement, in *Abi-Najm v. Concord Condominium, LLC*, the Supreme Court of Virginia considered a claim of fraud in the inducement. 280 Va. 350, 362-63 (Va. 2010). There, that court distinguished the facts of that case from a line of cases wherein the court "concluded that [ ] [the] allegations were legally insufficient to support an actionable tort claim because a contract or an agreement was the source of the duty allegedly breached." *Id.* (citing *Dunn Construction Co. v. Cloney*, 278 Va. 260, 268 (Va. 2009) ("The fact that the representation was made in order to obtain payment . . . does not take the fraud outside of the contract relationship."); *Augusta Mutual Ins. Co. v. Mason*, 274 Va. 199, 206 (Va. 2007) ("The duties that [the agent for the insurance company] allegedly violated by making fraudulent representations . . . arose solely by virtue of the Agency Agreement."); *Filak v. George*, 267 Va. 612, 618 (Va. 2004) ("[T]he plaintiffs' claim . . . merely sought recovery for losses allegedly suffered as a result of [the defendant's] failure to fulfill her oral contract."); and *Richmond Metro. Auth. v. McDevitt Street Bovis, Inc.*, 256 Va. 553, 560 (Va. 1998) ("Nothing in the record suggests that [the defendant] did not intend to fulfill its contractual duties at the time it entered into the [contract]."). But the court determined that where, as here, the alleged fraud was said to have occurred "*before* a contract between [ ] two parties came into existence, [it] therefore c[ould] not logically follow that the duty [ ] [a defendant] allegedly breached f[ound] its source in the [c]ontract[ ][.]" *Abi-Najm*, 280 Va. 350 at 363 (emphasis in original).

Considering these propositions, this Court is constrained to reject Defendant's argument that Plaintiff's fraudulent inducement claim should be dismissed with prejudice because Plaintiff has not alleged the existence of a valid contract. In the case at bar, based on the allegations

10

provided in the Amended Complaint, the alleged fraudulent inducement occurred before Plaintiff and Defendant entered into a subcontracting agreement for Plaintiff's work under the OPMG Contract. Significantly, while Plaintiff alleges that it and Defendant had "commenced *negotiations* for a subcontract[,]" Dkt. 15, ¶ 17 (emphasis added), the Amended Complaint does not suggest that the subcontract was yet formed when Ms. Miller made the alleged misrepresentations. It seems, however, that at some point before a subcontract was formed, the fraud alleged seems to have occurred.

While in some instances "allegations [ ] [may be] legally insufficient to support an actionable tort claim because a contract or an agreement was the source of the duty allegedly breached," *Abi-Najm*, 280 Va. at 362-63, here, it also does not appear that the teaming agreement that the parties entered into was the contractual source of a duty that Defendant may have owed Plaintiff. That appears so because the teaming agreement contemplated the parties' and MHG's obligations in procuring the OPMG Contract—not any further performance *after* the OPMG Contract was awarded. *See* Dkt. 15, ¶¶ 12-14. Indeed, in the Amended Complaint, Plaintiff claims that "[*i*]*f awarded the follow on OPMG [ ] [C]ontract*, [ ] [Defendant] agreed to *negotiate* subcontract with Plaintiff . . ." and Plaintiff also describes that under the teaming agreement it agreed to take certain actions geared toward creating and submitting the "*proposal* package" for the OPMG Contract. *Id*. at ¶¶ 12-14 (emphasis added). Thus, the Court finds that any duty that Defendant owed Plaintiff did not emanate from the teaming agreement, whereas the actions that Plaintiff alleges it was fraudulently induced to perform were those to *perform* under the OPMG Contract—not *procure* it. And where no subcontract was formed, based on the arguments presented to the Court, this Court finds that Plaintiff's claim of fraudulent inducement sounds in

tort, and thus the Court rejects Defendant's conclusion that the claim must fail because no valid contract was formed.

B.   Whether Plaintiff has Alleged a Misrepresentation of a Positive Statement of Fact

Next, Defendant asserts that the Amended Complaint should be dismissed because Plaintiff "has not alleged misrepresentation of a positive statement of fact[,]" as required by Virginia law. Dkt. 31, 6.  Defendant contends that because it "attempt[ed] to [pay] [ ] [Plaintiff] by way of a settlement and release agreement," Plaintiff's Amended Complaint should be dismissed pursuant to Rule 12(b)(6) as "it cannot logically be concluded that [ ] [Defendant] never intended to pay Concord for its services." *Id*. at 6-7 (underline in original) (citing *Fransmart, LLC v. Freshii Dev., LLC*, 768 F. Supp. 2d 851, 865-66 (E.D. Va. 2011); *Cyberlock Consulting, Inc. v. Info. Experts, Inc.*, 876 F. Supp. 2d 672, 681 (E.D. Va. 2012)).

Plaintiff maintains that Defendant's argument is misplaced because Plaintiff has pleaded sufficient facts to demonstrate that Defendant did not have the present intent to perform at the time that it made certain promises to Plaintiff.  Dkt. 33, 5.  Plaintiff specifically asserts that the promises at issue in its fraudulent inducement claim are those made by Defendant's President and Chief Executive Officer, Ms. Miller, to Plaintiff's President and Chief Executive Officer, Mr. Wood.  *Id*. (citing Dkt. 15, ¶¶ 20-22, 27, 28, 35, and 42).  First, Plaintiff argues that via Ms. Wood, Defendant promised, with no present intention, to "pay [ ] [Plaintiff] at the rate [ ] [Defendant] submitted to OPMG in its pricing proposal" in exchange for Plaintiff's performance on work under the OPMG contract during the interim period.  Dkt. Nos. 15, ¶ 18; 33, 5.  The second promise that Plaintiff asserts Defendant had no present intention to perform was its promise to "accept a 10% fee for the [OPMG] Contract interim period of performance."  Dkt. Nos. 33, 5; 15, 22.

"In Virginia, it is well-settled that 'fraud must relate to a present or pre-existing fact, and cannot ordinarily be predicated on unfulfilled promises or statements as to future events.'" *Fransmart LLC*, 768 F. Supp. 2d at 865 (quoting *McMillion v. Dryvit Sys., Inc.*, 262 Va. 463, 552 (Va. 2001) (internal quotations omitted)).  Also, as both parties acknowledge, "Virginia courts recognize that a promisor may commit fraud if the promisor has no intent to perform at the time that the promise is made." *Fransmart, LLC*, 768 F. Supp. 2d at 865 (citing *Supervalu, Inc. v. Johnson*, 276 Va. 356, 368 (Va. 2008) ("[I]f a defendant makes a promise that, when made, he has no intention of performing, that promise is considered a misrepresentation of present fact and may form the basis for a claim of actual fraud.")).  "While circumstantial evidence may be used to support a reasonable inference of fraud, mere failure to perform is generally not sufficient evidence of a lack of intent to perform at the time the contract was formed." *Cyberlock Consulting, Inc.*, 876 F. Supp. 2d at 681 (citing *Poth v. Russey*, 99 Fed. App'x 446, 454 (4th Cir. 2004).

At this 12(b)(6) juncture, this Court finds that Plaintiff has pleaded sufficient facts to suggest that Defendant had no intent to perform at the time that it made the promises at issue.  In the Amended Complaint, Plaintiff does not merely allege that Defendant failed to pay Plaintiff for all of its working during the interim period at the agreed upon rate, or pay Plaintiff the additional 10% fee for its work.  Additionally, Plaintiff claims that when Defendant did not pay Plaintiff, Defendant's Chief Executive Officer and President, Ms. Miller, offered to pay Plaintiff from her personal funds and also offered to pay Plaintiff a fraction of what Defendant apparently promised it would pay Plaintiff—notwithstanding a certain subcontracting rule that she claimed barred her ability to pay Plaintiff at all.  Dkt. 15, ¶¶ 24, 30, 33.  According to Plaintiff's pleadings, Ms. Miller did so even though Defendant had already been compensated by the Army.  *Id*. at ¶ 36.  Considering these facts as a whole, and viewing the facts in the light most favorable to Plaintiff—

13

as this Court must do at the 12(b)(6) stage—the Court finds that Plaintiff has pleaded sufficient facts to suggest that Defendant may not have had a present intention to pay Plaintiff at the time that it made its promises to do so.  And this is true where, as here, "[i]n alleging fraud or mistake . . . intent . . . and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).

To be sure, this finding does not preclude a later determination that the evidence ultimately suggests the contrary.  However, at this stage of the litigation, where the Court is tasked with determining the sufficiency of the Amended Complaint, this Court simply finds that Plaintiff has pleaded enough facts to support a plausible claim that Defendant had no intention to perform at the time that it made its promises.

C.  Whether Plaintiff Improperly Relies on Oral Statements that Violated Federal Law

Defendant also asserts that this Court should dismiss Plaintiff's fraudulent inducement claim because "[t]he alleged 'promises' asserted in the Amended Complaint could not have been reasonably relied upon by [ ] [Plaintiff]."  Dkt. 31, 7 (citing *Fransmart, LLC*, 768 F. Supp. 2d at 867).  Defendant argues that because Plaintiff "was aware of the payment limitations of 13 C.F.R. § 125.6" and "because [ ] [Plaintiff] was an 'ostensible contractor' which [ ] [Defendant] was 'unusually reliant' upon[,]" Plaintiff "could not have reasonably relied upon" promises that Plaintiff "knew—or should have known—would be unenforceable."  Dkt. 31, 7.

At the outset, it is important to note that in this case, this Court previously addressed whether certain "alleged oral and implied contracts [ ] [were] unenforceable pursuant to 13 C.F.R. § 125.6(a)" and whether plaintiff was an "ostensible contractor" within the meaning of the phase as set forth in 13 C.F.R. § 121.103(h)(4).  Dkt. 14, 9, 11-12, 17.

14

As for whether § 125.6(a) barred recovery, this Court noted that § 125.6(a)(1) provided, in relevant part, that:

> "[i]n order to be awarded . . . an 8(a) contract . . . a small business concern must agree that: (1) in the case of a contract for services (except construction), it will not pay more than 50% of the amount paid by the government to it to firms that are not similarly situated . . . ."

Dkt. 13, 16 (quoting 13 C.F.R. § 125.6(a)(1)).  And while Plaintiff pleaded that Defendant owed it a sum of $173,646.16, "Plaintiff [ ] [had] not allege[d] in its Complaint[,] the total sum of money the Army paid Defendant for performing under the OPMG Contract."  Dkt. 13, 17 (citation omitted).  The Court reasoned that "[w]ithout being able to consider the overall sum of money that the Army awarded Defendant under the OPMG Contract, this Court [ ] [was] at best left [to] guess[ ] as to whether the OPMG Contract was unlawfully formed in light of 13 C.F.R. § 125.6(a)(1)."  Dkt. 13, 17.  And, as the Court explained, because "Plaintiff b[ore] the burden of pleading sufficient facts within its Complaint to demonstrate that the contracts it allege[d] were breached, were lawfully formed in the first instance[,]" dismissal was warranted as to Plaintiff's claims of breach of contract.  *Id*.

In its Amended Complaint, Plaintiff has now pleaded that "[a]lthough [ ] [Defendant] [received] approximately $1,349,620 in payment from the Army for the base period of the [OPMG] Contract, [ ] [Defendant] kept the entire payment and refused to pay [ ] [Plaintiff] the compensation it was due."  Dkt. 15, ¶ 36.  Construing the facts in the light most favorable to Plaintiff, the Court presumes that Plaintiff means that the Army paid Defendant $1,349,620.00 under the OPMG Contract.  *Id*.  If, as Plaintiff alleges, Defendant owed Plaintiff a sum of $173,646.16 for Plaintiff's work during the interim period, that would be approximately 12.87% of the amount the Army paid Defendant, *see id*. at ¶¶ 29, 32—a far cry from the 50% threshold set forth in 13 C.F.R. § 125.6(a)(1).  Accordingly, without more, it is unclear how Plaintiff's

15

awareness of the 13 C.F.R. § 125.6 payment limitations would make it unreasonable for Plaintiff to rely upon Defendant's promises.

Further, in addressing the "ostensible contractor" issue when Defendant's Motion to Dismiss the original Complaint was before the Court, this Court recognized that whether a subcontractor is deemed an "ostensible subcontractor" is an issue germane to whether a contractor and subcontractor are joint venturers for the purpose of a Small Business Administration ("SBA") "size determination." *See* Dkt. 13, 9-11.  Importantly, however, the SBA must first make a "size determination"—inclusive of deciding whether a subcontractor is an "ostensible subcontractor"—before this Court may make its determinations. *See id.* at 9 (quoting *Tinton Falls Lodging Realty, LLC v. United States*, 800 F.3d 1353, 1361 (Fed. Cir. 2015) ("Congress has given SBA the exclusive authority to establish definitions and standards for determining whether an entity qualifies as a 'small business concern' for purposes of federal law.")).  And because the period for the SBA to make such a finding had elapsed, the Court was constrained to dismiss Plaintiff's breach of contract claims with prejudice.  Dkt. 13, 14-15.

Here, Defendant essentially maintains that it was unreasonable for Plaintiff to rely on Defendant's promises because Plaintiff knew it was an "ostensible subcontractor."  *See* Dkt. 31, 7.  But inherent in this argument is the notion that it has been presumptively established or is an undisputed fact that Plaintiff was, indeed, an "ostensible subcontractor."  That fact has not, and for the reasons set forth above (*supra*, p. 16) and in the Court's prior Order (Dkt. 13, 9-15), cannot be decided by this Court without the SBA first making that determination.  And in assessing the sufficiency of Plaintiff's Amended Complaint, the Court observes that Plaintiff's status as an "ostensible subcontractor" is not a fact that Plaintiff has pleaded in its Amended Complaint.  Accordingly, this Court is not in a position to simply accept this fact as true based upon the

pleadings.  As such, the Court must reject Defendant's argument that Plaintiff could not have reasonably relied upon Defendant's promises because Plaintiff was an "ostensible subcontractor."

D.   Whether Plaintiff's Deficiencies in its Original Complaint Persist in the Amended Complaint

The Court dismissed Plaintiff's fraudulent inducement claim as set forth in the original Complaint because Plaintiff offered no more than conclusory allegations in support of that claim. *See* Dkt. 13, 22.  Because it was not clear that amendment would be futile as to that cause of action, the Court granted Plaintiff leave to amend that claim, *id.* at 23, and Plaintiff did so. *See generally* Dkt. 15.  Unlike in the original Complaint,  Plaintiff in the Amended Complaint offers more than the bald assertion that "[Defendant] [ ] mislead [Plaintiff] [ ] into believing that  [ ] [Defendant] would accept a 10% fee for administrative support and pay [ ] [Plaintiff] at its stated rates for [ ] [Plaintiff's] interim [OPMG] Contract support."  *See* Dkt. 13, 22 (citing Dkt. 1-2, ¶ 69).  In its Amended Complaint, Plaintiff now explains how Defendant did so—particularly in paragraphs 22 and 24 of the Amended Complaint.  *See, e.g.*, Dkt. 15, ¶¶ 22, 24.

Still, Defendant argues those paragraphs do not provide adequate factual support to show that Defendant made a material misrepresentation of its intention to fully pay Plaintiff.  Dkt. 31, 8-9.  Paragraph 22 of the Amended Complaint provides:

> [a]s a further inducement for [ ] [Plaintiff] to continue performance during the interim period, Ms. Miller agreed that [ ] [Defendant] would accept a 10% fee for the [OPMG] Contract interim period of performance.  Specifically, in a May 14, 2018, email, sent to Mr. Wood at approximately 6:09 p[.]m[.], Ms. Miller stated "All [ ] [of Plaintiff's] employees w[ould] remain on [ ] [Plaintiff's] roles until which time [ ] [Defendant] ha[d] received its DD254 (this should be less than 30 days), during this period [ ] [Defendant] will charge a 10% pass through on the monthly labor until the positions are transferred."

Dkt. 15, ¶ 22.  Defendant maintains that in light of this paragraph, "[c]learly, there was no promise or misrepresentation (nor an agreement) made by" Defendant.  Dkt. 31, 8.  Instead, Defendant offers that this paragraph describes a "proposal" that Defendant made to Plaintiff.  *Id.*  Construing

the facts set forth in paragraph 22 in the light most favorable to Plaintiff, this Court finds that these facts, at the 12(b)(6) stage, are sufficient to support a finding that Plaintiff has adequately pleaded that Defendant made a material misrepresentation as to how Plaintiff's employees would be compensated.

Also, in paragraph 24 of the Amended Complaint, Plaintiff indicates that:

[b]y email, dated June 24, 2018, and forwarded to Mr. Wood at 5:38 p.m., Ms. Miller made another false promise to Mr. Wood to induce his and [ ] [Plaintiff's] continued performance of the OPMG Contract.  By this time, Mr. Wood was concerned about the lack of pay [ ] [Plaintiff] had received from [ ] [Defendant]. Thus, in her June 24th email, Ms. Miller stated that she would use her personal funds to ensure that [ ] [Plaintiff's] personnel working on the OPMG Contract were paid.  Although she had represented to Mr. Wood that [ ] [Defendant] had not been paid by the government, [ ] [Defendant] had in fact been the government had not paid [ ] [Defendant], [ ] [Defendant] had likely been paid almost $100,000 or more by this time.

Dkt. 15, ¶ 24.  Defendant maintains that the email that Plaintiff references in paragraph 24 contains the subject line "Update on coordination and transition of personnel[,]" and therefore "[i]t is clear that the e-mail is discussing the "transition of personnel" and not some attempt to induce alleged continued performance.  Dkt. 31, 9.  Considering Defendant's argument, it would be naïve to imagine that the email subject line would bear some more overt heading such as, perhaps, "Attempt to Fraudulently Induce Continued Performance."  The subject line of an email need not message some magic words in order for the email itself to constitute fraudulent misrepresentation.

Also, Defendant adds that in the email, Ms. Miller also indicated that she "'[did not] [ ] want [ ] [Plaintiff's employees] to go without being paid so [she] [ ] [could] use personal funds to provide [ ] [Plaintiff with] a partial invoice payment.'"  Dkt. 31, 9 (quoting Dkt. 31-2) (underline added in brief).  This email seems to be incorporated by reference in Plaintiff's Amended Complaint, is integral to and explicitly relied on by Plaintiff in that document, and Plaintiff does not challenge that document's authenticity.  Therefore, this document, which is attached to

Defendant's Motion, may be considered by this Court.  Still, the Court must view the facts set forth in the Amended Complaint and in the email in the light most favorable to Plaintiff.  In doing so, the Court finds that the allegations in paragraph 24 in the context of the entire Amended Complaint, coupled with those in paragraph 22, are sufficient to form the basis of a fraudulent misrepresentation claim such that dismissal of the fraudulent inducement claim is not warranted.

IV.   CONCLUSION

Accordingly, for the aforementioned reasons, it is hereby ORDERED that Defendant's Motion to Dismiss is DENIED.

It is SO ORDERED.

Alexandria, Virginia
June 10, 2021

_____ /s/ _____
Rossie D. Alston, Jr.
United States District Judge